LOTTINGER, Judge.
This is a suit in Workmen’s Compensation filed by petitioner, Frank Rider, against Trinity Universal Insurance Company, the Workmen’s Compensation insurer of Máx-ime Fontenot, for benefits under the Workmen’s Compensation Act. LSA-R.S. 23 :- 1021 et seq. Suit was filed in forma pauperis. The trial court awarded judgment for petitioner at the rate of $26.33 per week, beginning March 21, 1955 for a period not to exceed 400 weeks, plus legal interest, and for medical expenses not to exceed $1,000. The defendant has taken this appeal.
The petitioner alleges that, prior to the alleged accident, the petitioner was employed as a workman for Fontenot in the construction of a rice mill in the Parish of Evangeline, Louisiana. While so employed, on or about March 21, 1955 petitioner was lifting a roll of roofing paper, when he suddenly felt a sharp pain in the pit of his stomach, immediately sensed a taste of blood, and a few minutes later found streaks of blood in his feces. Petitioner requested lighter duties of his immediate superior, and worked for a period of time at such lighter duties, but has not been able to work since that date. He alleges that he is suffering from a gastro-intestinal condition, and is permanently and totally disabled as a result of the alleged accident.
The defendant filed an answer denying that there was an accident, denying that there is any disability, and in the alternative, claiming that in the event that there is a disability that it was in no way caused or aggravated by petitioner’s employment.
Upon trial of the matter, petitioner testified that on the day of the alleged accident he attempted to lift a roll of roofing paper when he felt pain and got a warm feeling. He sat down for a short period and continued to load buckets of tar out of a barrel for a period of some three-quarters of an hour or an hour. He left the job to go home some fifteen or twenty minutes early. He told Littell Vizinat that he had hurt himself, however he admits that there were no witnesses to the alleged accident. Petitioner claims that he went home and went to bed. He continued to have pain, vomited blood that night and the next day again, and two days later went to see his doctor, Dr. Savoy.
Littell Vizinat testified that the petitioner came up to him and asked to be replaced because he had hurt himself. Mr. Vizinat further testified that he gave petitioner a light job cleaning up and that Mr. Rider left the job about an hour before quitting time. The petitioner never reported the accident to' his foreman, Hadley Vizinat, who was not present, however, as stated above he did report it to Littell Vizinat who was in charge during the foreman’s absence.
Mr. Máxime Fontenot, petitioner’s employer, testified that the petitioner did not report the accident to him until some time later, after he had been discharged from the hospital, and then petitioner told him that he had become sick on the job. Mr. Fontenot further testified that on several occasions, in the interim, petitioner had borrowed money from him.
After seeing Dr. Savoy, the doctor sent petitioner to the Charity Hospital in Lafayette, Louisiana. Although petitioner claims that he entered the hospital two days after the alleged accident, the hospital records disclose that he did not enter same until March 31, 1955, which was some ten days a-fter the alleged accident. The history in the hospital records show that petitioner began having diarrhea on Monday, which was evidently March 28. The record further shows that petitioner vomited blood on Tuesday. His condition was diagnosed as a hemorrhage of a peptic *827 ulcer. Later he was operated on which consisted of an omentumectomy and 80% gastrectomy, resulting in the removal of the entire lesser curvature of the stomach.
Dr. Savoy testified by way of deposition on behalf of defendant. The substance of his testimony is to the effect that petitioner had an “acute Abdomen” and so he sent him to the hospital. He further testified to the effect that he has observed petitioner on the street since his return from the hospital and that he walked in a creeping manner.
Dr. Hugh Price, a surgeon of Lake Charles, also testified on behalf of defendant. He, as well as the other doctors agree that petitioner had a peptic ulcer. Dr. Price is of the opinion that the episode of lifting had no connection with the bleeding of the ulcer; that the ulcer was present prior to the lifting episode, and that the employment of petitioner in no way aggravated the ulcey.
Dr. Mims Mitchell, Jr., a specialist in internal medicine, was in agreement with Dr. Price. He went rather thoroughly into the theory of peptic ulcers, and concluded that the alleged accident, or the employment of petitioner, did not cause the ulcer nor did it aggravate same. He stated that the hemorrhage could have occurred at any time even if the patient were in bed or resting. Dr. Mitchell testified as follows:
“Q. Doctor, hemorrhage from an ulcer may be caused by the digestive juices just eating away the ulcer at that time causing a complete rupture, is that correct? A. The usual cause for this type of thing is that the ulcer crater as it erodes the intestinal lining erodes also a blood vessel, which allows this blood vessel to bleed within the lumen or within the insides of the gastro-intestinal tract, which we call a gastro-intestinal hemorrhage.
“Q. And doctor, this could have occurred just as easily if the patient had been in bed or resting? A. Yes.”
On cross examination and again on redirect examination Dr. Mitchell repeated and re-emphasized his testimony to the effect that the hemorrhage was not caused by or connected with his employment. He testified as follows:
“Q. And do you say then that it is possible that the hemorrhage of a peptic ulcer could be initiated by the momentary rise in pressure against a weakened wall? Is that possible? A. I do not feel that that is what occurs. By and far, peptic ulcer bleeding may occur at any time under any circumstances. It’s happened in the patient’s sleep and is usually not associated with any type of particular violent exertion or strain or such mechanism. I do not think it can be specifically stated that this patient’s bleeding occurred at the act of his straining. For example, this patient’s history was that while he was lifting or straining that he felt something come up into his throat and when he felt this he vomited or at least he spat up blood. It seems logical that if a hemorrhage had occurred at the actual time of this patient’s straining he could not have had time enough for that degree of bleeding into the gastrointestinal tract to have occurred so that he was able to expectorate blood, because your stomach can easily hold 1,000 cc. of fluid and your small intestinal tract can hold quite a bit of blood so that the bleeding would have to have been of a tremendous magnitude for that to have occurred within the matter of a second or two, which this patient did not have. If bleeding would have been of this magnitude he would have been dead within a few minutes.
******
“Q. Doctor, when you say that there is no feeling that strain is associated with the initiation of hemorrhage in peptic ulcers — A. No. I say I do not feel that this particular strain initiated this man’s bleeding.
*828 “Q. And do you say that because you think there are many other more important factors that account for hemorrhaging as a general rule?. A. I feel that the cause of this man’s hemorrhage was an erosion of the blood vessel by the ulcer and that the erosion of the blood vessel — of the ulcer was not related to the fact that this man was doing manual labor but because of the fact that the ulcer had eroded into the blood vessel and that this may have occurred at any time whether or not the man was working, lifting, sleeping, or when the actual rupture occurred.
"Q. And that is the general cause of hemorrhaging, isn’t it? A. Yes, from a peptic ulcer.
“Q. Yes, sir; and you would say that is the major cause of hemorrhaging from a peptic ulcer, is it not? A. Yes.
“Q. And since you said that it is possible that the strain could have had some effect on it I would ask you now whether you know in this particular case whether the hemorrhaging was occasioned by this customary or usual factor or by perhaps the other minor, negligible factor of strain? A. The degree of rise of the arterial pressure on lifting or straining is of small magnitude. If this were not so and other compensatory factors came in, we all would have ruptured our blood vessels very frequently, none of which the ordinary individual does.
* * * * * *
“Q. And in conclusion, doctor, I am sorry we have been rather long in this thing, I would ask you from your knowledge of physiology, medicine, would you say that a doctor could ever state categorically and be certain that he is right that a strain did or did not contribute to the initiation of a hernia in a peptic ulcer? A. Of a hernia?
“Q. Of a hemorrhage of a peptic ulcer? Pardon me. A. Categorically I think that your question is valid, but this would necessitate, if this were the opinion of the entire medical profession, all patients that had a proven ulcer would be advised from a medical standpoint to do no lifting or straining or anything known, of which no writing or literature that I am familiar with has ever been recommended as a treatment for the patient that has active ulceration of the gastrointestinal tract, otherwise all patients that had ulcers woud be advised to go to bed for complete rest.
******
“Q. And I will simply rephrase my question. This is my last question, doctor. In your opinion could a doctor or could you in any given case state categorically that this strain occasioned this hemorrhage of this peptic ulcer ? A. I think it would be facetious to try to say that this caused this to occur.
******
“Q. And doctor, you have stated the reasons, but I think I am correct in concluding that your testimony is to the effect that this alleged straining episode had no causal connection with the bleeding? A. That is true.”
Dr. Robert O. Emmett, a surgeon of Lake Charles, testified on behalf of petitioner. It was his opinion that the lifting episode could have caused the hemorrhage of the ulcer, although it could not have caused the ulcer itself. Dr. Emmett used the theory that the lifting would have caused an increase in blood pressure, which could have caused the weakened area to hemorrhage. He, like Dr. Mitchell, devoted a large portion of his testimony to theory. Both Dr. Mitchell and Dr. Price disagreed with the theory of Dr. Emmett. Dr. Emmett never did examine the petitioner, his knowledge of petitioner’s condition was gained only through reference *829 to the hospital records. Dr. Emmett further said that the ulcer could have bled at any time, day or night, no matter what the activity of petitioner might have been. Dr. Emmett admitted that there was no way of knowing whether or not the lifting aggravated the ulcer so as to cause it to bleed.
So we have the testimony of Dr. Price and Dr. Mitchell, who seem to be rather definite, or at least as definite as any doctors we have seen, to the effect that the lifting episode was not the cause of the hemorrhage. Dr. Mitchell is a specialist in this field. Dr. Price, on the other hand, is a specialist in the field of surgery, as is Dr. Emmett. Against their testimony, we have the testimony of Dr. Emmett which is to the effect that the lifting episode could have caused the hemorrhage because of a possible increase in blood pressure. Both Dr, Mitchell and Dr. Price deny this.
We feel that the preponderance of the medical testimony is to the effect that the lifting episode was in no way the cause of the peptic ulcer, nor the aggravation thereof. We therefore feel that the petitioner has failed to show any causal connection between the alleged disability and the alleged accident.
We might further mention that the medical testimony shows that petitioner is unable to return to work at the present time, but that such inability is due to his weakened condition, and not to the result of the ulcer. The medical testimony indicates that many people with such conditions perform heavy manual labor without any difficulty.
We feel that the petitioner has failed to show, by a preponderance of the evidence, that the accident, if there was an accident, was the cause of his present disability. While we always hesitate to reverse the decision of the Lower Court on findings of fact, we feel that the medical testimony requires a judgment for defendant.
For the reasons hereinabove assigned, the judgment of the Lower Court will be reversed and there will be judgment herein in favor of defendant dismissing petitioner’s suit.
Judgment reversed.